Morning, your honors. Alan Ides, representing the Southern California Institute of Law, the appellant. There are four issues I would like to address, and I will go right to the ripeness issue first. I think this issue, in light of Susan B. Anthony List versus Dry House, has to be re-characterized as, more generally, justiciability under Article III's injury in fact requirement. And as that case makes clear, the standard is, or the question is, whether there is a substantial risk that the threatened harm will occur. And so although the district court did address this on prudential grounds, the court in Dry House strongly suggested that if Article III is satisfied, it might be inconsistent with the virtually unflagging duty of a court to exercise jurisdiction to apply these prudential rightness factors. Well now, Counselor, which issue are we on? Is this the Guidelines 2.3d issue? This is the Guidelines 12.1 and 12.2, the 40%. Oh, the 40% issue, OK. Now, is that issue right? Well, that's what I'm saying. It is right. It is most definitely right. But I think the real question is whether the injury in fact standard is satisfied. The Dry House case. It doesn't take effect, as I read the materials, until 2016 or 2017. In other words, it would allow it to affect you. You still have a chance to meet the 40% threshold by sometime in 2017. Am I misreading? Well, in the abstract, you're not misreading. But that's looking at the case in the abstract. It's not looking at the facts of the case. Well, what facts, to your mind, show that there is, at present, an injury in fact? At present, an injury in fact. The way I would approach it is, if I were a lawyer, an informed lawyer, and my client came to me and gave me these facts, and I'll talk about the facts in a second, and asked, do you think there's a substantial risk that we will be subject to a notice of noncompliance, which has effects, a substantial risk that we will go on probation, and a substantial risk that our accreditation will be terminated? Any informed lawyer looking at the facts of this case is alleged in the complaint would tell his clients, yes, there is a substantial risk. Is there an imminent threat of injury? The imminent threat of injury, which is the substantial risk test, is premised on the fact that the 40% rule applies retroactively. And so the notice of noncompliance that SCIL has received was, in fact, based on seven bar exams that were given before the rule even went into effect. And from a mathematical point of view, it was virtually certain from the day the rule went into effect, and from the day the case was filed, that there would be a notice of noncompliance. And the notice of noncompliance is not without effect, as recent filings with this court have indicated. And in addition, there is no indication that the CBE is not going to proceed. In fact, they are taking all the actions necessary to push us toward the termination. There are basically three future injuries that we're talking about when the case was filed. The notice of noncompliance, the probation, and the threat of termination. So these notices of noncompliance, you can take steps to come into compliance with the rules. The only step you can take to come in, that's a great question, Your Honor. The only step you can take to come into compliance is to get your bar exam rate up. That's the only step you can take. And isn't that still mathematically possible or not? It's mathematically possible. It's mathematically possible. We could speculate as to that possibility. Though now that it looks like it is within range, the CBE is considering raising the number. So we're not sure exactly how that's going to work out. Yeah, but we're dealing with what you can ask for a waiver. You can ask for a waiver, but there's nothing in the record that indicates the basis on which a waiver would be granted or that the CBE, with its new rule that it's not right. We don't know how it will play out. How what will play out? Your request for a waiver. If the CBE has said that, in fact, we could possibly get a waiver, but they haven't. You've gotten waivers of other things too, haven't you? In the past we have, but those have been taken away. The CBE has offered no suggestion as to any grounds on which it would issue a waiver in this case. It says it could. Have you asked for a waiver? It's too early to ask for the waiver. Exactly. That's exactly right. Your Honor, what you're suggesting, though, is that we have to wait until the ax falls. And this is having this, I would like to emphasize, we're talking about future injuries. There are present injuries, and the district court overlooked them. The present injuries are an immediate $1 million devaluation of the investment possibilities in FVIL. That is uncontested in the record. What do you mean, investment possibilities? We were looking for investments in order to expand the school, to increase the enrollment in Santa Barbara campus, and develop the physical facilities. And in order to get those investments, you have to be evaluated. And our valuation dropped by $1 million. That was an immediate injury. The other immediate injury is that we had to take action to comply. An informed attorney would have told the client, under these circumstances, that you better do something. You better change your curriculum. And you're going to have to spend money to do that. And one of the ironies of this case is when we did try to change our curriculum to mandate that our students take what was, in essence, a form of the baby bar, the CBE told us we couldn't do it. So we can't take any actions to improve our bar pass rate unless we do it to the entering classes. That puts us in a pretty tough place. So those are present injuries. Suppose we agree with you that it's ripe and we can reach the merits. Why can't the state bar require that you put this link on your website? OK, the rightness issue only goes to the 40% rule. But if you want me to jump to that issue, I'd be glad to. Are you on that one, too? I'm on that. Yeah, I'm totally on that. 40%, you're not contesting that 40% is a not unreasonable threshold level imposed by the CBE, are you? We're contesting that there is no reasonable basis for that particular choice in the record. What do you think it should be, 20%, 5%, 0%? Your Honor, with all due respect, I don't think that's the question. It's not what I think it should be. It's what facts did the CBE rely on in determining that 40% was within the range of factors that should be used. You can't just pluck a number out of a hat and say 40%. In their brief, CBE says, we have to have a reasonable basis for that. But if you read their brief, they never explain why 40% or why something in that range is relevant. There are a whole number of possible reasons, but they haven't asserted them. Don't you think 40% is actually a low number for a school? What kind of a school? A law school that's going to do this practice. I'm asking you a question, do you want to answer it? I do, I do. Sorry, I got excited. OK, so the school holds itself out as teaching law so that people can practice law in the state of California, right? It does that, but it also expects some of its students will never take the bar and will use it for professional advancement in other areas. In the calculation of the 40%, students who decide they're never going to take the bar, they just want to learn the law and maybe go off and be novelists or something, are they included in the 40% number, in the total number? So they wouldn't be even included. This is your students who actually want to take the bar. Correct. And that's a 40% passage rate of those who actually want to get a license to practice in California. Yes. OK. But there was a question there. You asked me if I thought that. My question was, isn't that, I mean, it's relatively. Isn't that a reasonable number? 40% of those who actually want to get a license to go to your school, it seems to me like that's a pretty low number. I mean, I'm obviously going to ask them what their rationale is, since one of the tests here is a rational basis test. But I'm just saying on the face of it. Well, I think you have to take into account that the pass rate, for example, on the last July bar exam was 48% per state. And in a recent February bar exam, it was 33% per state. So I'm not sure that 40% is necessarily a reasonable figure. I think we have to look at the whole context. And my sense is that the CBE just kind of had a gut reaction. Well, 40% seems reasonable. Well, there has to be some explanation for it. And maybe they will come up with one today at oral argument. But they haven't come up with one in their brief. So your best argument for why this is right is because you've had to spend money to comply with the new programs and adjustment of the curriculum. And at the same time, you're losing investment monies that might also help you comply with the rule. I would say that's a very good argument for us. What's your best argument? Why this isn't right? I think that's our best argument, that rightness is not an issue at all. But I think we have a very strong argument that there is a substantial risk, given past performance on the bar exams, and the fact that we have a retroactively loaded rule, that we will be in one year on probation, and two years from that, subject to termination proceedings. I think there is a very significant chance that that's going to happen. And I think this is the test. It's a common sense look at the actual facts of the case, which is what the court did in Susan B. Anthony versus Dry House. We can speculate that maybe they won't enforce it. We can speculate that maybe they'll give a waiver. But I don't think that kind of speculation goes to whether there was an Article III imminent injury in this case. So I think we have two strong arguments. Do you want to go to the 2.3D issue? Yes. The central question in this First Amendment challenge is whether the Zouder rule applies. And the parties have, if it doesn't apply, then clearly either central Hudson or strict scrutiny applies. And under either of those standards, this rule would be invalid, because there are a substantial number of less intrusive ways of accomplishing this goal. So the burden for us is Zouderer. And the parties have debated whether Zouderer can apply beyond deception. But I would like to just change the ball, just move it a little bit. I think that the CBE's claim is one of deception. So it would look like it does fall within Zouderer. But there's something strange about this case that takes it out of the Zouderer rule. In all of the cases applying Zouderer, the party being forced to make the disclosure is the one who engaged in the deception, whether it was intentional or accidental. In this case, if you look on pages 45 and 46 of the government's brief, they say that the deception, the consumer deception, is a product of the fact that we, the CBE, require unaccredited schools to take a baby bar, but we don't require accredited schools. And we're worried that this action that we take may lead consumers to think that they'll, and this is their phrase, they'll pass the bar if they go to a Cal-accredited school. And we want to ameliorate that deception. So the government says, we've done something that's deceived, and we're going to require a third party who conceitedly has not done anything deceptive to remedy our deception. I want to make sure I understand. We're talking about the link on the website? Yes, we're talking about the link on the website. And it applies to everybody, not just your school? It applies to everybody. And this is just undisputed, factual information about what the pass rate is, just pure, sheer statistics? It's pure statistics, yes. How would this be any different than, say, a regulation that requires the calorie count on a candy bar? Because the person selling the candy bar that has the calories is the person that is potentially doing some harm to the consumer. This is, I really think this is a- It's just factual information, just statistics. Snickers has 140 calories in it. Yeah. Okay, what stops Snickers from coming in like you do and say, well, that's compelled speech. It is compelled speech, but it falls within Zouderer because Snickers is responsible for the distribution of that candy. I think this is a very important distinction. You are being asked to extend Zouderer to a situation where the third party being required to make the disclosure is not responsible for the potential health risk, or is not responsible for, in this case, the deception. How about a requirement of a payloan, one of these payday loan companies to disclose what the annual percentage rate is of a- They are making the deception. What's deceptive? I mean, how is it any more or less deceptive? There is an inherent deception if they are telling you, you know, your loan rate is this, but in fact, there is an annual percentage that you'll pay that is significantly higher than what you might expect. Next type of setup, where you go to a law school and you have a very low chance of passing the bar. Unless I've told you that you have a high chance, and we specifically tell applicants and our students that don't expect to pass the bar just because you went to. You're going to have to take a bar review class that we are not preparing you. This is not a bar review class. So all of your hypotheticals are, they're trade hypotheticals, but they have one flaw in them. And the flaw is that in each of your hypotheticals, the third party is responsible for the risk that's being imposed on the consumer. SCIL is not responsible for that. I think I understand your argument. So what really, the question that I'll probably ask them is, why compel your school or all the schools to have a link to the bar passage rate? Why doesn't the state bar board of examiners have the information on its website? And anybody who's interested in going to school could just look at its website and it doesn't have to compel anyone else to disclose it. Well, it's a beautiful question. And in fact, their website does have that information on it. It's readily accessible. So that really makes it more interesting. Why are you requiring third parties to disclose it if you already disclosed it yourself? On the other hand, what's the burden to you of having the link? The burden to us having a link is a violation of our first amendment right. We should not be forced to say anything, whether it's factual or opinion, that we think doesn't belong on our website. Thank you, counsel. The time for your side has expired. Thank you. We'll hear from the bar. Good morning. Excuse me. Good morning, your honors. May it please the court. Michael von Lohenfeldt for the appellees. Let me start with the 2.3D question because we just finished with that. Counsel's argument, he just made that up. There's no case law that has ever suggested that it matters whose statements are being countered or filled in or informed in analyzing whether a compelled disclosure of factual information is constitutional. The case, I mean, we have mercury disclosures. We have the props. There's a prop 65 warning. I don't know if it's on the federal building, but on pretty much every other building you step into about dangerous chemicals. That's not there because the person who runs the building is responsible for that. That's there because it's a required disclosure. Calorie counts. The test is not whether you are somehow being required to cure your own speech. The test is much simpler than that. Is it commercial, which is essentially conceded here as to the accreditation page? Is the information factual and non-controversial, which was just conceded? And it is pure statistics. If you look at the bar's website, it's just statistics for each school. There's no comment or commentary on it. It's a link to the site on your website? Correct. Straight out gives you information as to bar passage rate for every school. Yes, your honor. And in fact, if you want to see an example of that, in the record, we had submitted below various pages showing the scores from the school. So that's exactly what shows up on the website. And Judge Wardlaw, you asked the question, why couldn't the bar just publish it itself? Well, obviously it can and does publish it itself, but this is a rational basis test. The state bar has concluded, rationally, like the state of California has for every post-secondary private school in California, and many other jurisdictions do, that licensing information, that is to say, passage rates on licensing tests, is important information that prospective students are entitled to have. In the same way, when you go to McDonald's, you're entitled to know how many calories are big enough. What's the government's interest in that? Why? Why does the government think it's a government interest that people who attend SCIL, or who are planning to apply to SCIL, should know what the bar passage rate is? What's the government interest? There are two government interests in that, both of which are equally important. One is the interest in informational transparency, that the people get information that we believe they're interested in at the most likely place they're gonna be looking for. It's seen in connection with the accreditation page. So they see that the school's accredited, and they get this information at the same time. And we have an interest in informational transparency that is sufficient. But there's also an interest in making sure that a false inference is not drawn from the accreditation. And this is actually quite important, both for this and for 12.1. You really have to get the connection between the first year law student's exam, or the baby bar, and accreditation. So we have an exam that we make people take to make sure that they are not wasting their time and money in law school. Those are for people who are in unaccredited schools, right? Well, so the baseline is that you have to take the test, unless you're in an accredited school. So accreditation is the key out of the test, right? So we have a standard now, 12.1, 12.2, that's tied to that interest to make sure it's... Because it's totally illogical to exempt people from the test if the students at that school can't pass the bar exam. That's the whole purpose for the test. So why would those students be exempt? But also as to the disclosure, it's a perfectly reasonable inference for an applicant to make that if I'm going to accredited school, I must have a better chance of passing the bar than those people who are required to take the first year law student's exam. And again, Your Honor, this is a rational basis test we're talking about. We don't need evidence that this deception occurs. The bar is concerned about this, and that is all that's required in the same way that that's all... I'm just wondering, why does the state bar have certain unaccredited schools where you don't take the baby bar, and then it gives other schools accreditation even though it's concerned about its low passage rate? There's a lot in that question that I'm gonna try to unpack. So first off, as to the pass rates, and counsel's arguing about the low pass rate on certain bars, it's really important to distinguish between the first time pass rate and the total pass rate because we have a lot of repeat takers on the bar. When you're looking at any individual exam statistics, the first time pass rate is nowhere near 50%. It's substantially higher than that. And in fact, to be an ABA school, you need a 75% pass rate to remain accredited as an ABA school. So then, when we're talking about these pass rates, this 40%, it's not a first time pass rate, it's a cumulative rate. So if you have a student who goes to a school, and they take the exam and they fail, and they take it again and they fail, and the third time they pass, that counts as a pass for the 40% calculation for these schools. There's another piece to your question about unaccredited schools, and I think this is the answer to that. California is somewhat unique in that it allows people to go to unaccredited law schools and take the bar. Most states don't do that. And I think that's because the state recognizes that there are always reasons why someone might not get into an accredited school. And as long as that person can pass the first year law student's exam, which is there to protect them, as the Supreme Court has said, they should be allowed to take the bar and become lawyers. And there are certainly many fine lawyers who've gone to unaccredited schools. But it makes no sense to have an accreditation system which exempts you from that exam, and to have that, to say it's irrational, constitutionally irrational, that's their position, to tether accreditation to what is frankly, as you pointed out, a very low percentage of bar passers. Council, Mr. Ides suggests that the 40% threshold which would apply to his class of school may not survive the rational basis test. What's your response? I think it's eminently rational and reasonable. Based on what? Based on several things. Well, first, there's an, I think, obvious and immediate connection between the quality of a law school education and whether you can pass the bar or not. We cited numerous law review articles that discuss that. That's the basic common public understanding. I would be shocked if there was anyone who applied to law school who was totally agnostic as to how people who went to that law school did on the bar. Well, why is it 40% versus, let's say, 30%? You know, this gets into the area of legislative line drawing, where there's basically, we're not required to have some mathematical nicety as to the line drawing. There is always a bit of discretion that a legislature picks once you, or in this case, a rules creating committee picks once you draw a line. So, I can't point you to a specific factual basis why it's 40 instead of 41 or 30 line, but 40 is within the realm of reasonableness. No, what did, what was decided? Like, what did the bar exam, what was the factual investigation or process that led to the 40%? So, there was a rule that was proposed. Requests were made for public comment and for comment from the regulated schools as to what would be an appropriate number. The 40% number came up through that process and the, based on the public comment that was received, the committee decided that 40% was a reasonable number. That, this is a rational basis review question. There's no necessity. I mean, we, here in Beach Communications, we're not even required to say what the rationale for the rule is. There's no requirement for legislative fact-finding. There's no requirement that we do studies. But what if you had made the rule 90%? I don't think that's a constitutional issue so much as that it, if we made it 90%- Is there another line you could draw? I don't think there's a line we can draw. I think at some level, the question is, is the factor relevant to accreditation? And if it is, we're allowed rationally to apply it pretty much in any line that we think is reasonable. But, you know, it's easy to talk about the extremes and say whatever was 5%, whatever was 90%, we're at 40%. And this school, they say, oh, we can't possibly make that. Half of the exams that count for the termination of their accreditation, if that happens, haven't occurred yet. Why, actually, I misspoke. One of those exams occurred last month, but it hasn't been scored yet, the July 2015 exam. But then you have two exams in 2016 and two exams in 2017. So we have five bar exams where we have no idea how many students, graduates, I should say, are gonna take the exam and how they will do. That is half of the exams that count. They're at, what, 28% now? How on earth can we say that they cannot make 40%? And I would be shocked if they tell their students when they enroll them, by the way, you shouldn't expect to pass the bar because we don't think enough of you can pass to even make 40%. Maybe that's neither here nor there, what they tell their students. But a lot of things could happen. And in terms of waiver, you asked the question about could they waive the rule? If they're at 28%, I don't know what the committee will do. I'm not in charge of the committee. I would be surprised if they got a waiver. If they're at 38% and they've shown dramatic improvement, those are different facts. We don't know what the facts are gonna look like at the end of 2017. So it's impossible to say how the committee will apply its discretion. Now that we're in the ripeness issue, what's your response to Mr. Ide's argument about the dry house case? The threat's not imminent. The threat won't occur until the end of 2017. He suggests that it is imminent because the value of the school in terms of its investment value has decreased because of all of this and it can be traceable immediately to the notice. So my response to that is that's not a constitutionally recognized or protected interest. Regulated parties do not have the right to say, a buyer who wants to purchase my business is worried that three years from now something might happen to me and therefore my business is worth less. And so, or actually when the case was filed five years from now, so therefore I've suffered a constitutional injury. There is simply no authority that we're aware of for the proposition that that type of alleged economic harm, it's not even really harm, it's impact. A potential buyer might want to pay less, can be, for which we're totally unresponsible, is sufficient to ripen a claim. And in fact, we cite some cases in our briefs suggesting that that were true. You know, there's a lot of legal uncertainty that would help price things more accurately.  on whether or not you could frame an argument that a buyer of a good or a business would be willing to pay something different if they knew the answer, then I would suggest to you that every legal question is always going to be right, because any smart market actor is always gonna want as much information as possible about what the rules are gonna be in the future. Let me ask you, so these ripeness questions can be tricky, especially since we have regulations that have been promulgated now for effective later and other things can happen, but since I've been scratching my head over it to be frank about it, do you think we would be well-advised to err on the side of finding it ripe and then reaching the merits? I do, Your Honor, because one way or the other, this is gonna come up. This is gonna come up, the merits are fully briefed. We think the rational basis is eminently clear. So I don't think it's ripe. Ripeness is primarily a doctrine that the court is concerned with in terms of controlling your docket and not reaching unnecessary questions. But in this case, and given where the briefing is, I don't see the harm and I see a lot of potential good in the court reaching the ultimate merits. And I would note that we have another argument, it's not a ripeness argument, but we don't believe there's a property interest in future accreditation. There's clearly an interest in their accreditation today. And this accreditation expires when? 2016. 2016. Right. So that actually makes the first question all the less ripe. Because their accreditation could expire even before they finish the process to get to whether or not the 40% passage rate. That's correct. A decision could be made in 2016 not to renew their accreditation for whatever appropriate reason that would be. That would have to go through a California Supreme Court review process. But that certainly does impact, in our view, the ripeness issue. I will say though, it's a rational basis test. I think the matter is fully briefed in front of you. If the court was inclined to reach the merits, I think you've got everything you need to do that. Thank you, counsel. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Silverman, Wardlaw